**Herbert and Marsha STOLLER, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

Nos. 91–1647, 92–1087, 92–1089, 92–1090 and 92–1091.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1992.

Decided June 11, 1993.

Herbert Stoller, appellant pro se.

Joan I. Oppenheimer, Attorney, Dept. of Justice, with whom Gary R. Allen, and Kenneth L. Greene, Attorneys, Dept. of Justice, Washington, DC, were on the brief for appellee.

Before EDWARDS, BUCKLEY, and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Herbert and Marsha Stoller appeal and the Commissioner of Internal Revenue cross-

appeals a judgment of the Tax Court determining the Stollers' income tax liabilities for the years 1979 through 1981 with respect to income from a certain partnership's investments in securities. Applying the Internal Revenue Code as it read prior to the addition of § 1234A in 1981, we uphold the position of the taxpayers in both appeals.

## I. Background

From 1979 to 1982 Herbert Stoller was a partner in Holly Trading Associates, which invested in short-term government securities, such as Treasury Bills, and traded in the futures market. Holly also created synthetic short-term securities by means of a straddle. To create a bull straddle, Holly would enter into contracts simultaneously to buy a long-term Treasury Bond and to sell an identical T–Bond for delivery a number of months in the future. To create a bear straddle, Holly would contract to sell a long-term T–Bond and to buy an identical T–Bond some months in the future.

Holly's investment strategy centered around arbitrage. The partnership would enter into contracts to buy and to sell government securities with the same maturity dates but with different yields. This type of arbitrage would often involve two straddles, and hence four separate contracts. Holly terminated some of its arbitrage positions in their entirety; others it terminated only in part, replacing one leg of the straddle with a new contract identical in all respects to the terminated contract but with a different maturity date. (We refer to the new contract as a replacement contract.) Holly might purchase a replacement contract whether it closed its prior contract by offset or by cancellation.

In order to close an existing contract by offset, Holly would enter into a new contract establishing an offsetting position. For example, a contract to buy a commodity on a date certain would be offset by a contract to sell that commodity on the same date. Both contracts would remain in effect until the settlement date. Holly reported any gains and losses stemming from contracts closed by offset as capital gains and losses.

When Holly closed a contract by cancellation, its government securities dealer charged or credited it with a cancellation fee equal to the difference between the contract price of the security and its market value at the time of cancellation. Holly reported gains and losses resulting from cancellations as ordinary income and losses.

In 1987 the Commissioner notified the Stollers of claimed deficiencies with respect to their tax returns for 1979 through 1981. The Commissioner's principal claim was that Holly's transactions were a sham. In the alternative he alleged that the cancelled contracts were not in fact cancelled and therefore that any losses "were capital losses for Federal income tax purposes from the sale or exchange of capital assets."

The Tax Court found that some of the cancelled contracts resulted in capital losses rather than ordinary losses because a cancellation followed by the purchase of a replacement contract is the economic equivalent of an offset. The Stollers appeal both that determination and the imposition of a penalty under § 6653(a) for disregarding IRS rules and regulations. The Commissioner cross-appeals, alleging that Holly's losses were not deductible losses at all because they were not incurred in a transaction entered into for profit.

## II. Analysis

In order to incur a capital loss (or gain) within the meaning of § 1222 of the Internal Revenue Code, the taxpayer must have "sold or exchanged" a capital asset. The Commissioner does not dispute that closing a futures contract by offset results in a capital gain or loss. The Stollers in turn concede that cancelling such a contract would result in a capital gain or loss under the Code as amended in 1981. The narrow dispute raised by the taxpayers' appeal concerns the treatment of a cancellation under the law as it stood prior to 1981. In her cross-appeal, the Commissioner raises the broader question whether Holly's losses were deductible at all.

### A. The Taxpayers' Appeal

The Commissioner relies upon a line of cases best exemplified by *C.I.R. v. Ferrer*,

304 F.2d 125 (2d Cir.1962), in which the court, applying the "substance over form" doctrine, determined that contract cancellation was in essence a sale and thus resulted in a capital gain. *See also Bisbee–Baldwin v. Tomlinson,* 320 F.2d 929 (5th Cir.1963). The Stollers rely primarily upon the so-called "disappearing asset" cases such as *Leh v. Commissioner,* 260 F.2d 489 (9th Cir.1958), which hold that a loss incurred from a contract cancellation should be treated as an ordinary loss because the underlying contract, or asset, "disappeared" when it was cancelled. In other words, because the asset was neither sold nor exchanged, there could be no capital loss.

Neither party comes fully to grips with the other's line of cases. Nor are there any cross-references in the leading cases. Doctrinal conflicts tend to sprout like mushrooms in such dark corners of the law, but here we think there is none.

In *Ferrer,* the estimable Judge Friendly held that the gain realized by a contract should be treated as a capital or an ordinary gain depending upon the nature of the interest "sold." In that case Jose Ferrer had purchased from Pierre LaMure the rights to produce a stage play and a motion picture based upon LaMure's novel *Moulin Rouge.* John Huston later became interested in the movie rights. Ferrer and LaMure then agreed to cancel this contract for a consideration to be paid to Ferrer by Huston's company, Moulin.

The *Ferrer* court expressly rejected any distinction between this termination of the taxpayer's contract right and its outright sale, reasoning that the nature of the transaction in both instances was the same.

In the instant case we can see no sensible basis for drawing a line between a release of Ferrer's rights to LaMure for a consideration paid by Moulin ·and a sale of them, with LaMure's consent, to Moulin or to a stranger who would then release them.... Tax law is concerned with the substance, here the voluntary passing of "property" rights allegedly constituting "capital assets," not with whether they have been passed to a stranger or to a person already having a larger estate.

*Id.* at 131.

After the cancellation of Ferrer's contract, there was still an extant contract for the movie rights with essentially the same terms but a different signatory. Therefore, the court held, the substance over form doctrine applied. *See also Bisbee–Baldwin,* 320 F.2d 929 (where, in substance, the taxpayer transferred a servicing contract to a third party, the court looked to the underlying contract to determine whether the cancellation fee should be treated as ordinary income or a capital gain). Because the consideration for the cancellation came from a third party, it was in substance a sale. Here, however, the underlying contracts were cancelled in substance as well as in form. When a contract was cancelled, it did not merely change hands; it ceased to exist altogether.

The Tax Court adopted its own approach reminiscent of the substance over form reasoning in *Ferrer* (which it did not cite). The court determined that the contracts Holly cancelled should be treated as having generated ordinary or capital losses depending upon "whether or not, after the cancellation, any rights or property interests created by the contract remained." *Stoller v. Commissioner,* 60 T.C.M. (CCH) 1554, 1567, 1990 WL 212864 (1990). The Tax Court found that, insofar as cancelled contracts were replaced by contracts between the same parties for the same commodities (albeit with new prices and delivery dates), "[t]he substance of the transactions, although called forward contracts closed by cancellation, was in reality forward contracts closed by offset." *Id.* at 1566. In contrast, where a contract was cancelled and no replacement contract was made, the court held that the Stollers had properly reported an ordinary loss because the cancellation was "a complete termination of both parties' rights to the straddle transaction." *Id.* at 1567.

The problem with the Tax Court's reasoning is that cancellation and offset are different in substance as well as in form. When a contract is cancelled it simply ceases to exist. When a contract is offset, both the original contract and the offsetting contract remain in

effect until the date for delivery. The Tax Court, implicitly recognizing that offset and cancellation are indeed distinct, found that cancellation amounted to offset only where Holly purchased a replacement contract. The court reasoned that in such cases, the essentials of the transaction lived on because the replacement contract was in most respects identical to the cancelled contract. The subsequent purchase of a replacement contract cannot, however, transform a cancellation into an offset. Therefore, the Stollers properly treated the losses incurred in cancelling the contracts as ordinary losses.

This interpretation of the law prior to the 1981 amendment to the Code is reflected in the legislative history of that amendment. The Congress amended the Code specifically to provide that the gain or loss resulting from the cancellation of a contract is a capital gain or loss for tax purposes. *See* 26 U.S.C. § 1234(A). While that amendment does not govern this case (because the transactions at issue here took place before the effective date of the amendment), the Senate Finance Committee Report on the amendment is informative with respect to the preexisting law:

### Present Law

The definition of capital gains and losses in section 1222 requires that there be a "sale or exchange" of a capital asset. Court decisions have interpreted this requirement to mean that when a disposition is not a sale or exchange of a capital asset, for example, a lapse, *cancellation,* or abandonment, the disposition produces ordinary income or loss....

### Reasons for Change

Some taxpayers and tax shelter promoters have attempted to exploit court decisions holding that ordinary income or loss results from certain dispositions of property whose sale or exchange would produce capital gain or loss.... The Committee considers this ordinary loss treatment inappropriate if the transaction, such as settlement of a contract to deliver a capital asset, is economically equivalent to a sale or exchange of the contract.

S.Rep. 97–144 (1981) (emphasis added). *See also* H.Rep. 97–215 (1981) U.S.Code Cong. & Admin.News p. 105. Clearly the Congress thought that it was changing the law so that a cancellation would no longer necessarily result in an ordinary loss.

We recognize that at best "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress." *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 650, 110 S.Ct. 2668, 2678, 110 L.Ed.2d 579 (1990) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960)). *See also United States v. Texas,* —— U.S. ——, —— n. 4, 113 S.Ct. 1631, 1635 n. 4, 123 L.Ed.2d 245 (1993). We refer to the background understanding upon which the 97th Congress acted not because it is authoritative with respect to the intent of the 83rd Congress, but because it is a careful and contemporaneous account of the state of the law—i.e., the statute as interpreted by the courts—as of the time that the 97th Congress sought to change it. We simply agree with the 97th Congress that prior to the 1981 amendment the prevailing rule was that the cancellation of a contract resulted in an ordinary loss for tax purposes.

In light of this conclusion, there is no basis for finding that Stoller either was negligent or intentionally disregarded Internal Revenue Service (IRS) rules and regulations in treating the losses incurred from contract cancellations as ordinary losses. Accordingly, no penalty could properly be imposed upon him under § 6653.

### B. The Commissioner's Cross–Appeal

■ In her cross-appeal, the Commissioner questions whether the losses incurred as part of Holly's trading plan were deductible at all, i.e. even as capital losses. Under § 108(a) of the Deficit Reduction Act of 1984, as amended, a loss arising from one leg of a straddle entered into before 1982 is deductible only "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business." In the latter situation, a loss is deductible only if the transaction from which it arose was entered

into "primarily" for profit. *See, e.g., Landreth v. Commissioner*, 859 F.2d 643, 647–49 (9th Cir.1988).

The Commissioner argues that the Tax Court erred in determining that all of Holly's losses were deductible although not incurred in a trade or business and in some cases not the result of a transaction entered into for profit. Specifically, the Commissioner points to the Tax Court's statement that "[t]here clearly were some tax-motivated transactions by Holly...." *Stoller*, 60 T.C.M. (CCH) at 1564. The Stollers respond that the Tax Court actually and correctly determined that all of Holly's transactions were entered into for profit, and erred in determining that the losses were not incurred in a trade or business. We need not reach the taxpayers' second contention, since we agree with the first.

The Tax Court stated that:

Although a portion of the trading in forward contracts was done in a manner specifically to minimize tax savings, i.e., the contract cancellations, those cancellations occurred because of the market conditions and a situation that arose after Holly entered into the initial trades. Therefore, Holly's intent at the time the trades were initially entered into was not to realize great tax savings, but to realize a profit from the trading as a whole.

*Stoller*, 60 T.C.M. (CCH) at 1564. In this context it is quite clear that the court meant only that the timing of some trades was tax motivated, not that Holly entered into any contracts without a profit motive. As we read it, therefore, the Tax Court found that the transactions were entered into for profit and that consequently the losses were deductible. The court's finding is amply supported by the record, and its conclusion follows inexorably.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the Tax Court to the effect that all losses incurred in Holly's trading plan are deductible, and reverse that judgment insofar as it holds that Holly's contract cancellations resulted in capital rather than ordinary losses and that a penalty was properly as-

sessed against the taxpayers. Accordingly, we enter judgment in the amount of $384,011.70, the amount of the asserted deficiencies and accumulated interest paid by the taxpayers to the IRS, plus interest and costs as allowed by law.

*So ordered.*