# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2015

Lyle W. Cayce
Clerk

———

No. 14-60295

———

PILGRIM'S PRIDE CORPORATION, Successor in Interest to Pilgrim's Pride Corporation of Georgia, formerly known as Gold Kist, Incorporated, Successor in Interest to Gold Kist, Incorporated and Subsidiaries,

> Petitioner – Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

> Respondent – Appellee.

———

Appeal from the Decision of the United States Tax Court

———

Before PRADO, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

In this tax case, we must determine whether Pilgrim's Pride Corporation's loss from its abandonment of securities is an ordinary loss or a capital loss. The Tax Court—in what appears to be the first ruling of its kind by any court—ruled that 26 U.S.C. § 1234A(1) applies to the abandonment loss and requires that it be classified as capital. We disagree. Because § 1234A(1) only applies to the termination of contractual or derivative rights, and not to the abandonment of capital assets, we REVERSE the judgment of the Tax Court and RENDER judgment in favor of Pilgrim's Pride.

No. 14-60295

**I.**

Pilgrim's Pride is the successor-in-interest to Pilgrim's Pride Corporation of Georgia f/k/a Gold Kist, Inc., which was the successor-in-interest to Gold Kist, Inc. (Gold Kist). In 1998, Gold Kist sold its agriservices business to Southern States Cooperative, Inc. To facilitate the purchase, Southern States obtained a bridge loan that was secured by a commitment letter between Southern States and Gold Kist. The commitment letter permitted Southern States to require Gold Kist to purchase certain securities from Southern States (Securities). Southern States exercised this option and Gold Kist purchased the Securities for $98.6 million.[1]

In early 2004, Gold Kist and Southern States negotiated a price at which Southern States would redeem the Securities. Gold Kist suggested a price of $31.5 million, but Southern States offered only $20 million. Gold Kist's Board of Directors, instead of accepting the $20 million offer, decided to abandon the Securities for no consideration. The Board reasoned that a $98.6 million ordinary tax loss would produce more than $20 million in tax savings. Gold Kist irrevocably abandoned the Securities for no consideration, effectuating its abandonment by sending Southern States and Wachovia Bank letters stating that Gold Kist "irrevocably abandons, relinquishes, and surrenders all of its rights, title and interest" in the securities.[2] On its timely filed Form 990-C for the tax year ending June 30, 2004, Gold Kist reported a $98.6 million ordinary loss deduction.

---

[1] The Securities include 40,000 shares of Step-Up Rate Series B Cumulative Redeemable Preferred Stock from Southern States and 60,000 shares of Step-Up Rate Capital Securities, Series A from a Southern States trust.

[2] After abandoning the Securities, Gold Kist recorded a loss on its financial statements of $38.8 million. The parties have stipulated that the securities were worth at least $20 million.

No. 14-60295

Five years later, while Pilgrim's Pride was in bankruptcy, the Commissioner issued a deficiency notice to Pilgrim's Pride with respect to Gold Kist's 2004 tax year. The deficiency notice asserted that Gold Kist's loss from the abandonment of the Securities was a capital loss, rather than an ordinary loss, creating a tax deficiency of $29,682,682. Pilgrim's Pride timely filed a petition in the Tax Court, challenging the Commissioner's determination that Gold Kist's abandonment loss was a capital loss.[3]

In their initial briefs and in court-ordered supplemental briefs, the parties focused their arguments on whether the abandonment caused the securities to become "worthless," making the loss a capital loss under 26 U.S.C § 165(g). The Tax Court then issued a *sua sponte* order requesting briefing on a new topic: whether § 1234A(1) applied to Pilgrim's Pride's abandonment of the Securities and required capital loss treatment. Predictably, Pilgrim's Pride argued that § 1234A was inapplicable; the Commissioner argued that § 1234A applied and rendered the abandonment a deemed sale or exchange of capital assets subject to capital loss treatment. The Tax Court agreed with the Commissioner, holding that § 1234A applied to the abandonment of the securities. Pilgrim's Pride timely moved for reconsideration. After briefing, the Tax Court denied the motion. This appeal followed.

## II.

The facts of this case were stipulated and the case was submitted for determination without trial. Accordingly, this case presents only legal

---

[3] The notice of deficiency also asserted a $5,936,536 accuracy-related penalty under 26 U.S.C. § 6662(a). The Commissioner has since conceded the penalty, and it is not at issue in this appeal.

No. 14-60295

questions that we review *de novo.* *See Cook v. Comm'r*, 349 F.3d 850, 853 (5th Cir. 2003).[4]

### III.

### A.

Taxpayers may deduct from their income "any loss sustained during the taxable year and not compensated for by insurance or otherwise." 26 U.S.C. § 165(a). The two overarching categories of allowable losses are capital losses and ordinary losses. *See Azar Nut Co. v. Comm'r*, 931 F.2d 314, 316 (5th Cir. 1991). The Tax Code "gives taxpayers a break on capital gains while restricting the tax benefits available from capital losses.[5]   Not surprisingly, then, taxpayers are wont to characterize their gains as capital and their losses as ordinary." *Campbell Taggart, Inc. v. United States*, 744 F.2d 442, 448 (5th Cir. 1984) (footnote omitted), *abrogated on other grounds by Arkansas Best Corp. v. Comm'r*, 485 U.S. 212 (1988). For obvious reasons, the IRS typically has the opposite inclination.

A capital loss is a loss from the "sale[] or exchange[]" of a capital asset. *See* 26 U.S.C. § 165(f).[6]   The abandonment of a capital asset for no

---

[4] Because the facts were stipulated, the parties agreed at oral argument that we could render judgment instead of remanding the case to the Tax Court. *See, e.g.*, *Estate of Elkins v. Comm'r*, 767 F.3d 443, 453 (5th Cir. 2014) ("The record on appeal is sufficient for us to render a final judgment and dispose of the sole issue in this case without prolonging it by remand at the cost of more time and money to the parties.").

[5] Specifically, capital losses are subject to two limitations: (1) the Tax Code permits capital losses only to the extent of capital gains and (2) the Tax Code limits corporations' ability to carry capital losses to future tax years. *See Campbell Taggart, Inc. v. United States*, 744 F.2d 442, 448 n.16 (5th Cir. 1984), *abrogated on other grounds by Arkansas Best Corp. v. Comm'r*, 485 U.S. 212 (1988).

[6] The Tax Code broadly defines "capital asset" as "property held by the taxpayer (whether or not connected with his trade or business)," but then excludes eight specific classes of property from capital-asset status. 26 U.S.C. § 1221; *see Arkansas Best*, 485 U.S. at 215–16. The parties agree that the Securities were capital assets.

consideration is not a "sale or exchange," as that term is used in § 165(f).  *See Echols v. Comm'r*, 935 F.2d 703, 707 (5th Cir. 1991) (approving ordinary loss treatment for abandonment of partnership interest); *see also Citron v. Comm'r*, 97 T.C. 200, 215 (1991) ("'The touchstone for sale or exchange treatment is consideration.'" (quoting *La Rue v. Comm'r*, 90 T.C. 465, 483 (1988))).  However, the Tax Code contains numerous provisions directing that certain transactions be treated as if they were sales or exchanges.  One such provision is § 1234A, which requires capital loss treatment for any loss "attributable to the cancellation, lapse, expiration, or other termination of -- (1) a right or obligation . . . with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer."  26 U.S.C. § 1234A(1).

Section 1234A was enacted in 1981 as part of the Economic Recovery Tax Act of 1981 (ERTA), Pub L. No. 97-34, § 507(a), 95 Stat. 172, 333 (1981).  Congress passed Section 1234A to address tax straddles, which are transactions in which taxpayers acquire offsetting contractual positions to obtain tax benefits without any economic risk.  For example:

> [A] taxpayer may simultaneously enter into a contract to buy German marks for future delivery and a contract to sell German marks for future delivery with very little risk.  If the price of German marks thereafter declines, the taxpayer will assign his contract to sell marks to a bank or other institution for a gain equivalent to the excess of the contract price over the lower market price and cancel his obligation to buy marks by payment of an amount in settlement of his obligation to the other party to the contract.  The taxpayer will treat the sale proceeds as capital gain and will treat the amount paid to terminate his obligation to buy as an ordinary loss.

S. Rep. No. 97-144, at 171 (1981).  Section 1234A closes this loophole by mandating capital loss treatment for the loss from the taxpayer's termination of his contractual obligation to buy German marks—even though no sale or exchange of German marks occurred.  *Id.*

No. 14-60295

26 U.S.C. § 165(g) is another provision which treats dispositions that are not technically sales or exchanges as equivalent to sales or exchanges. Section 165(g) characterizes as capital any loss that results when a security "becomes worthless during the taxable year," even if no actual sale or exchange occurred.

**B.**

The primary question in this case is whether § 1234A(1) applies to a taxpayer's abandonment of a capital asset. The answer is no. By its plain terms, § 1234A(1) applies to the termination of rights or obligations with respect to capital assets (e.g. derivative or contractual rights to buy or sell capital assets). It does not apply to the termination of ownership of the capital asset itself. Applied to the facts of this case, Pilgrim's Pride abandoned the Securities, not a "right or obligation . . . with respect to" the Securities. 26 U.S.C. § 1234A(1).

The Commissioner simultaneously agrees and disagrees with this reading of the statute. He agrees that § 1234A(1) applies only when a taxpayer terminates rights or obligations with respect to a capital asset, and he agrees that § 1234A does not *directly* apply to the abandonment of a capital asset itself. However, he contends that § 1234A(1) *indirectly* applies to the abandonment of a capital asset because the abandonment of a capital asset involves the termination of certain rights and obligations "inherent in" those assets. For example, ownership of stock is both ownership of the stock as a capital asset and ownership of rights in the management, profits, and assets of a corporation. On that logic, abandonment of stock terminates inherent rights "with respect to" that stock. Likewise, the Commissioner argues, the abandonment of the Securities terminated inherent rights "with respect to" the Securities. The Commissioner's position is that Congress, rather than simply stating that the abandonment of a capital asset results in capital loss, chose to

No. 14-60295

legislate that result by reference to the termination of rights and obligations "inherent in" capital assets.

We disagree. Congress does not legislate in logic puzzles, and we do not "tag Congress with an extravagant preference for the opaque when the use of a clear adjective or noun would have worked nicely." *Gutierrez v. Ada*, 528 U.S. 250, 256 (2000); *cf. Dep't of Homeland Sec. v. MacLean*, 135 S. Ct 913, 921 (2015) ("Had Congress wanted to draw that distinction, there were far easier and clearer ways to do so."). Instead, we assume that "the ordinary meaning of [statutory] language accurately expresses the legislative purpose." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (internal quotation marks omitted).

The Commissioner does not provide us any reason to forego that assumption in this case. He does not point to any other statute referring to so-called "inherent rights" as "right[s] or obligation[s] with respect to a capital asset." Nor does he identify any case interpreting § 1234A(1)—or any similarly worded statute—in the manner he proposes. The only authorities he cites are two instances in which the Supreme Court itself used the phrase "with respect to property" in reference to "inherent" property rights. *See United States v. Craft*, 535 U.S. 274, 282 (2002) ("[R]espondent's husband had, among other rights, the following rights with respect to the entireties property . . . ."); *United States v. Byrum*, 408 U.S. 125, 149 n.33 (1972) (noting that a person may control a corporation "by a combination of stock owned and that with respect to which the right to vote was retained"). These two examples do not persuade us. Although courts presume that Congress legislates with knowledge of the Supreme Court's interpretation of certain terms, *see Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010), courts do not presume that Congress's usage of an idiom will track the Supreme Court's own use of that idiom. At most, the two examples are evidence that the phrase "with respect to" grammatically can be

used in the manner suggested by the Commissioner.  "But that reading, even if ultimately comprehensible, is far too convoluted to believe Congress intended it." *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001).

The Commissioner's interpretation of § 1234A(1) also would render superfluous § 1234A(2), violating the rule of statutory interpretation that "we are obliged to give effect, if possible, to every word Congress used." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").  Section 1234A(2) mandates capital gain or loss treatment for the termination of "a section 1256 contract . . . not described in paragraph (1) which is a capital asset in the hands of the taxpayer."  For present purposes, the salient fact about section 1256 contracts is that, like all contracts, they provide their owner with what the Commissioner refers to as "inherent" rights and obligations.  Termination of a Section 1256 contract would terminate those inherent rights and obligations.  Accordingly, the termination of any Section 1256 contract which is a capital asset would be covered by the Commissioner's version of § 1234A(1): the termination of the Section 1256 contract would terminate inherent rights and obligations "with respect to" the Section 1256 contract, which is a capital asset in the hands of the taxpayer.  As a result, §  1234A(2) would not serve any function.

The Commissioner argues that § 1234A(2) is not superfluous because it ensures that "gain or loss from a deemed termination by offset[7] will be treated

---

[7] A termination by offset occurs when a party buys out its contractual right or obligation to buy or sell securities in the future.

No. 14-60295

as gain or loss from the sale of a capital asset." This argument fails for two reasons. First, terminations by offset likely are already covered by § 1234A(1), which broadly applies to gain or loss attributable to "cancellation, lapse, expiration, *or other termination.*" 26 U.S.C. § 1234A (emphasis added). Second, the Commissioner's reading would require us to hold that § 1234A(2)'s only purpose is to address termination by offset, and that Congress chose a remarkably convoluted way to effectuate that purpose. As we have discussed, we cannot ascribe to Congress "an extravagant preference for the opaque." *Gutierrez,* 528 U.S. at 256; *see also Williams v. United States,* 458 U.S. 279, 287 (1982) (declining to read 18 U.S.C. § 1014 as criminalizing check kiting because, *inter alia,* "if Congress really set out to enact a national bad check law in § 1014, it did so with a peculiar choice of language and in an unusually backhanded manner").

In contrast, Pilgrim's Pride's interpretation of § 1234A(1) leaves room for § 1234A(2) to operate. Capital gain or loss results from the termination of contractual or derivative rights with respect to capital assets, as well as to the termination of section 1256 contracts, even if the section 1256 contracts do not relate to capital assets (e.g. if they are settled with cash).

For the foregoing reasons, we hold that 26 U.S.C. § 1234A(1) does not apply to Pilgrim's Pride's abandonment loss.[8]

---

[8] Two administrative actions lend further support to Pilgrim's Pride's position. In Revenue Ruling 93-80, the IRS held that a taxpayer is allowed an ordinary loss on the abandonment of a partnership interest, even if the abandoned partnership interest is a capital asset. This Ruling directly contradicts the Commissioner's position in this case. Although the Commissioner asserts that Revenue Ruling 93-80 was superseded by a 1997 amendment to the statute at issue here, this begs the question presented in this case and is odd considering that the IRS never has formally revoked the Ruling and has relied on the Ruling since the statutory amendment.

The second administrative action is Treasury Regulation § 1.165-5(i), issued in 2007, which prospectively adopts an interpretation of 26 U.S.C. § 165(g) that an abandoned security is *per se* "worthless" and therefore any resulting loss is capital. If the Commissioner's

No. 14-60295

## C.

The Commissioner argues in the alternative that § 165(g) requires Pilgrim's Pride's abandonment loss to be treated as capital. Section 165(g) provides, in relevant part: "If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange . . . of a capital asset." Although the parties stipulated that the Securities were worth at least $20 million when Pilgrim's Pride abandoned them, the Commissioner argues that the Securities were "worthless" because they had no value to Pilgrim's Pride. In the Commissioner's view, a security becomes "worthless" when it is "useless" to its owner, regardless of its market value.

The Commissioner's position cannot be reconciled with our precedent. In *Echols v. Commissioner*, we stated that "the test for worthlessness is a mixed question of objective and subjective indicia. . . . [P]roperty cannot be treated as worthless for tax loss purposes if at the time it, objectively, has substantial value." 935 F.2d at 707; *see also Echols v. Comm'r*, 950 F.2d 209, 211 (5th Cir. 1991) (per curiam) (*Echols II*) ("Worthlessness and abandonment are separate and distinct concepts and are not, as urged by the Commissioner, simply two sides of the same coin . . . ."). Here, the parties stipulated that the Securities were worth at least $20 million at the time of their abandonment. Thus, the Securities were not objectively worthless.

The Commissioner attempts to distinguish *Echols* and *Echols II* on the ground that neither case specifically addressed the definition of "worthless" under § 165(g). It is true that both cases discussed worthlessness in the context of partnership interests and not in the context of securities. But the

---

interpretation of § 1234A(1) were correct, however, the abandonment of any capital asset already would result in capital loss. Thus, the Treasury Regulation would be superfluous.

No. 14-60295

Commissioner fails to offer any reason why "worthlessness" should have both objective and subjective components in the context of partnership interests, but only a subjective component in the context of securities.  Likewise, the Commissioner fails to explain why the terms "worthlessness" and "abandonment" should be distinct in the context of partnerships but conflated in the context of securities.

## IV.

Neither 26 U.S.C. § 1234A(1) nor 26 U.S.C. § 165(g) requires Pilgrim's Pride to treat its abandonment loss as a capital loss.  Accordingly, we REVERSE the judgment of the Tax Court with respect to the alleged deficiency and RENDER judgment in favor of Pilgrim's Pride.