147 T.C. No. 8

UNITED STATES TAX COURT

CRI-LESLIE, LLC, DONALD W. WALLACE, TAX MATTERS PARTNER,
Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1454-14.                              Filed September 7, 2016.

P, the tax matters partner for a limited liability company treated as a TEFRA partnership for Federal income tax purposes, asserts that the partnership is entitled to capital gain treatment under I.R.C. sec. 1234A for its right to retain forfeited deposits of $9,700,000 from a canceled sale of real property used in its trade or business in the 2008 tax year. The real property was not a "capital asset" as defined in I.R.C. sec. 1221(a) but was I.R.C. sec. 1231 property.

Held: The partnership is not entitled to capital gain treatment on the forfeited deposit. I.R.C. sec. 1234A applies only to capital assets, not to I.R.C. sec. 1231 property.

Leslie Joel Barnett, David L. Koche, Micah G. Fogarty, and Christopher R. Dingman, for petitioner.

Timothy A. Sloane, Andrew Michael Tiktin, and Lauren Epstein, for respondent.

OPINION

LARO, Judge:  This case is a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648.  Petitioner, Donald W. Wallace, the tax matters partner (TMP), asserts that respondent's notice of final partnership administrative adjustment (FPAA) issued to CRI-Leslie, LLC (CRI-Leslie), for the 2008 tax year improperly recharacterized an item of capital gain as ordinary income.  Respondent determined an adjustment to CRI-Leslie's Federal income tax return by increasing its ordinary income by $9,700,000 and decreasing net long-term capital gain by the same amount.[1]  This

_____

[1]In the FPAA respondent had made a further adjustment by increasing CRI-Leslie's net earnings from self-employment by $9,700,000.  However, respondent has since conceded this adjustment, and we do not address it here.

case upon joint motion of the parties was submitted fully stipulated for decision without trial.  See Rule 122.[2]

The issue before us, which is one of first impression, is whether CRI-Leslie is entitled to capital gain treatment under section 1234A for its right to retain forfeited deposits of $9,700,000 from a canceled sale of real property used in its trade or business in the 2008 tax year.  We hold that it is not.

## Background

### I.    Overview

Upon the parties' joint motion, the case is deemed fully stipulated under Rule 122.  The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein.  Petitioner is the TMP of CRI-Leslie.  This case is appealable to the Court of Appeals for the Eleventh Circuit absent stipulation of the parties to the contrary.

### II.    CRI-Leslie

CRI-Leslie was a Florida limited liability company during the 2008 tax year. For Federal income tax purposes, it was a TEFRA partnership.  Its principal place

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

of business was in Florida at the time the petition in this case was filed, and it has been on the accrual method of accounting at all relevant times.

During 2008 CRI-Causeway, LLC, a Florida limited liability company (CRI-Causeway), and Leslie Hawk, LLC, owned 100% of the capital, profits, and loss interests in CRI-Leslie. Capital Realty Investors, LLC, a Florida limited liability company (Capital Realty), owned 100% of CRI-Causeway and treated CRI-Causeway as a disregarded entity for Federal income tax purposes. Donald W. Wallace and Ben Wacksman each owned a 50% capital, profits, and loss interest in Capital Realty.

CRI-Leslie had filed a Form 1065, U.S. Return of Partnership Income, for the taxable year ended December 31, 2008. On November 20, 2013, respondent mailed the FPAA for the 2008 tax year to the partners of CRI-Leslie, including indirect partner Donald W. Wallace.[3]

III.    The Radisson Bay Harbor Hotel

On February 25, 2005, CRI-Leslie acquired for $13.8 million the Radisson Bay Harbor Hotel in Tampa, Florida. The property consisted of both land and

---

[3]Although Wallace was never a direct member of CRI-Leslie, this Court has appointed him CRI-Leslie's TMP under Rule 250 for purposes of this case.

improvements thereon. The improvements included the hotel, Crabby Bill's Restaurant, a swimming pool, a parking lot, and landscaping.

After purchasing the property CRI-Leslie hired a third party to manage the operations of the hotel and restaurant on the property.

On July 10, 2006, CRI-Leslie entered into an agreement of purchase and sale with RPS, LLC. Under this agreement, CRI-Leslie agreed to sell the property to RPS, LLC, for $39 million. The agreement was revised and amended several times over the next two years, including an increase in the property's purchase price to $39.2 million. RPS, LLC, did not close the purchase of the property from CRI-Leslie, and the agreement terminated in 2008 by its terms.

CRI-Leslie claimed deductions under section 162 on its 2008 partnership return for expenses related to the operation of the hotel. CRI-Leslie also claimed a deduction for depreciation under section 167 with respect to the hotel on its 2008 partnership return.

IV.    Forfeited Deposits

CRI-Leslie received $9,700,000 of deposits from RPS, LLC, in connection with the agreement. These deposits would have been applied to the property's purchase price if the sale had closed. RPS, LLC, defaulted on the agreement in

2008 and forfeited the total sum of deposits equal to $9,700,000 paid to CRI-Leslie in that year.

CRI-Leslie reported the $9,700,000 of deposits as net long-term capital gain on Schedule K, line 9a, Partner's Distributive Share Items, of its 2008 partnership income tax return. The parties have stipulated that this amount is includible in CRI-Leslie's income for taxable year 2008. The parties have further stipulated that from the date that CRI-Leslie acquired the property in 2005 and through December 31, 2008, the property was real property used in CRI-Leslie's hotel and restaurant business within the meaning of section 1221(a)(2). The parties have also stipulated that the property constitutes "property used in a trade or business", as defined by section 1231(b)(1), of CRI-Leslie for the 2008 tax year.[4] And the parties stipulate that had CRI-Leslie sold the property in 2008 pursuant to the agreement's terms, the gain from the sale would have resulted in net section 1231 gain reportable by CRI-Leslie on Schedule K of its 2008 income tax return.

---

[4]Respondent, however, does not stipulate that the $9,700,000 forfeited deposit is sec. 1231 gain.

## Discussion

### I.    Overview

The Code generally provides for more favorable tax rates on "net capital gain" than it does on ordinary income.  See sec. 1(h).  Net capital gain is "the excess of the net long-term capital gain for the taxable year over the net short-term capital loss for such year."  Sec. 1222(11).  Long-term capital gain, in turn, is "gain from the sale or exchange of a capital asset held for more than 1 year".  Sec. 1222(3).  Section 1221(a) defines capital assets generally.  Under section 1221(a)(2) specifically, a capital asset is "property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business".

In a given tax year, if there is net gain from the sale or exchange of depreciable property--or real property--used in a trade or business and held for more than one year, see sec. 1231(b)(1), the Code provides that such gain "shall be treated as long-term capital gains", sec. 1231(a)(1).  On the other hand, if there is a net loss from this type of property, that loss is treated as an ordinary loss.  Sec. 1231(a)(2).

The Code also addresses the treatment of gain and loss from the sale or exchange of options. Thus, in the case of a purchaser of an option, section 1234(a)(1) provides:

> Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him).

Section 1234B(a)(1) provides for similar treatment for gains or losses from securities futures contracts. For a grantor of an option, "gain or loss from any closing transaction with respect to, and gain on lapse of, an option in property shall be treated as a gain or loss from the sale or exchange of a capital asset held not more than 1 year." Sec. 1234(b)(1).

There is a separate Code section covering gains or losses from terminations of certain contractual rights:

> SEC. 1234A. GAINS OR LOSSES FROM CERTAIN TERMINA-
>       TIONS.
>
>       Gain or loss attributable to the cancellation, lapse, expiration, or other termination of--
>
>       (1) a right or obligation (other than a securities futures contract, as defined in section 1234B) with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer, or

(2) a section 1256 contract (as defined in section 1256) not described in paragraph (1) which is a capital asset in the hands of the taxpayer,

shall be treated as gain or loss from the sale of a capital asset. The preceding sentence shall not apply to the retirement of any debt instrument (whether or not through a trust or other participation arrangement).

The Internal Revenue Service has not promulgated any final regulations under section 1234A. However, under proposed regulations, any gain or loss from termination payments under notional principal contracts and settlements of obligations under bullet swaps and forward contracts is treated as gain or loss from a termination of the notional principal contract, bullet swaps, or forward contract, respectively. Sec. 1.1234A-1, Proposed Income Tax Regs., 69 Fed. Reg. 8898 (Feb. 26, 2004).

There is no question that section 1234A extends to rights or obligations relating to property that is described in section 1221(a)--that is, to capital assets. However, as noted above, section 1221(a)(2) excludes depreciable property used in the taxpayer's trade or business as well as real property used in his trade or business.

The parties have stipulated that the property at issue is real property used in CRI-Leslie's hotel and restaurant business, meaning that it falls within section

1221(a)(2) and is therefore precluded from classification as a capital asset under section 1221(a).  The parties have further stipulated that the property is properly classified under section 1231(b)(1) as "property used in the trade or business" of CRI-Leslie.  Had CRI-Leslie sold the property in 2008, the gain from the sale would have resulted in section 1231 gain, which would be "treated as long-term capital gains" under section 1231(a)(1).  We see no reason to challenge the parties' stipulations.

The sole issue still in dispute is whether "capital asset" as used in section 1234A extends to property described in section 1231.

II.    The Parties' Arguments

A.    Petitioner's Argument

Petitioner concedes that the Radisson Bay Harbor Hotel is property described in section 1231 (that is, section 1231 property).  However, petitioner goes on to make a novel argument that no court to date has yet squarely addressed: that Congress clearly intended for section 1234A to apply not only to payments received from contract terminations relating to capital assets but also to payments from terminations relating to section 1231 property.

Petitioner points out the unusual status of property subject to section 1231, including the fact that some commentators have referred to this property as "quasi-

capital assets". See, e.g., Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts, para. 50.1, at 50-2 (3d ed. 2000). Had CRI-Leslie sold the property in 2008, the resulting gain indeed would have been taxed at the same rate as long-term capital gain.

Petitioner contends that Congress enacted section 1234A to "ensure that taxpayers received the same tax characterization of gain or loss whether the property is sold or the contract to which the property is subject is terminated." Under this reasoning, it is inconsistent to treat termination payments on a contract as ordinary income where a sale of the underlying property would have been taxed at capital gain rates. Petitioner searches within the legislative history of section 1234A to distill a congressional purpose to tax similar economic transactions similarly. See, e.g., S. Rept. No. 105-33, at 134 (1997), 1997-4 C.B. (Vol. 2) 1067, 1214 ("In general, the Committee believes that present law is deficient since it (1) taxes similar economic transactions differently, (2) effectively provides some, but not all, taxpayers with an election, and (3) its lack of certainty makes the tax laws unnecessarily difficult to administer.").

Petitioner concludes that there is an inherent ambiguity in the apparent meaning of section 1234A and urges us to consider congressional intent. See United States v. Ron Pair Enters., Inc., 489 U.S. 235, 242 (1989) ("The plain

meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.' * * * In such cases, the intention of the drafters, rather than the strict language, controls." (alteration in original) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 571 (1982)). Even if the statute is unambiguous, petitioner contends that the legislative history is clearly contrary to the statute's plain meaning. Petitioner would have us hold that a "clear and unambiguous expression of legislative purpose" to include section 1231 property within the ambit of section 1234A overrides the "plain meaning" of section 1234A as extending to capital assets only.

B.    Respondent's Argument

Respondent urges us to interpret section 1234A narrowly and look no further than the statute's plain and unambiguous wording. According to respondent, section 1234A expressly references a "capital asset in the hands of the taxpayer." Since the Radisson Bay Harbor Hotel was section 1231 property, it by definition was not a capital asset as defined in section 1221 and thus cannot fall under section 1234A.

Respondent points to caselaw requiring Federal courts to give effect to congressional intent that is made clear in a statute. See Miller v. French, 530 U.S.

327, 336-340 (2000). And congressional intent is to be discerned primarily from the statutory text. See CTS Corp. v. Waldburger, 573 U.S. ___, ___, 134 S. Ct. 2175, 2185 (2014).

Respondent further notes that by the time Congress enacted section 1234A in 1981, the separate definitions of "capital asset" and "property used in the taxpayer's trade or business" were already firmly established in the Code. Since Congress presumably enacts legislation with knowledge of the law, "a newly-enacted statute is presumed to be harmonious with existing law and judicial concepts." Garcia v. Dep't of Homeland Sec., 437 F.3d 1322, 1336 (Fed. Cir. 2006) (citing Cannon v. Univ. of Chi., 441 U.S. 677, 696-698 (1979)). Indeed, had Congress intended to include section 1231 property within the scope of section 1234A, it might have used wording similar to that in section 1234(a)(1): "Gain or loss attributable to the sale or exchange of, or loss attributable to failure to exercise, an option to buy or sell property shall be considered gain or loss from the sale or exchange of property which has the same character as the property to which the option relates has in the hands of the taxpayer (or would have in the hands of the taxpayer if acquired by him)." Since Congress wrote section 1234A to apply only to gain or loss from a termination of rights or obligations relating to

property that is a capital asset, respondent concludes that the statute should be read narrowly to the exclusion of property described in section 1231.

III.     Applicability of Section 1234A to Section 1231 Property

       A.     Plain Meaning of Section 1234A

To determine whether section 1234A extends to section 1231 property, we must first turn to the relevant statutory text, Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002), which we interpret according to its plain meaning, Venture Funding, Ltd. v. Commissioner, 110 T.C. 236, 241-242 (1998), aff'd without published opinion, 198 F.3d 248 (6th Cir. 1999).  We look beyond the plain meaning of the words used in the statute only when their meaning is "inescapably ambiguous".  Id. (quoting Garcia v. United States, 469 U.S. 70, 76 n.3 (1984)). We therefore interpret a statute "with reference to the legislative history primarily to learn the purpose of the statute and to resolve any ambiguity in the words contained in the text." Allen v. Commissioner, 118 T.C. 1, 7 (2002).  Ultimately "[o]ur task is to give effect to the will of Congress, and where its will has been expressed in reasonably plain terms, 'that language must ordinarily be regarded as conclusive.'" Griffin, 458 U.S. at 570 (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)).

Section 1234A applies to the termination of "a right or obligation * * * with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer". The dispute in this case hinges on the meaning of "capital asset". As we delve into statutory interpretation, we are reminded of the admonition in <u>Brown v. Gardner</u>, 513 U.S. 115, 118 (1994), that "[a]mbiguity is a creature not of definitional possibilities but of statutory context[.]" Regardless of the myriad ways in which the term "capital asset" may be understood in various contexts,[5] section 1234A is a provision of this country's tax code. Therefore, we look to the Code for the appropriate definition, and specifically to section 1221. As we observed above, section 1221 defines "capital asset" as any property held by a taxpayer unless specifically excluded. Sec. 1221(a). The exclusion relevant here is the second one, removing from the definition of capital asset "property, used in * * * [a taxpayer's] trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business." Sec. 1221(a)(2). Petitioner concedes that the hotel property falls within this exclusion and so is not a capital asset as defined in section 1221.

---

[5]For example, to the mind of a non-tax lawyer, a capital asset can be "[a] long-term asset used in the operation of a business or used to produce goods or services, such as equipment, land, or an industrial plant", Black's Law Dictionary 140 (10th ed. 2014) (first definition), a definition that taken at face value would seem to include sec. 1231 property.

Notwithstanding the exclusion of depreciable property and real property used in a trade or business from the definition of "capital asset", section 1231 does cover certain such property. Specifically, it extends to "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 1 year, and real property used in the trade or business, held for more than 1 year". Sec. 1231(b). The interplay between sections 1221 and 1231 has been described well by Bittker and Lokken:

> Taken in combination, §§ 1221(a)(2) and 1231 have the following effects on depreciable property and real property used in a trade or business:
>
> 1. By virtue of § 1221(a)(2), these items are not capital assets, with the result that a disposition produces ordinary income or ordinary loss, except as provided by § 1231.
>
> 2. Under § 1231, if the asset has been held for more than one year, it usually produces capital gain if sales of such property during the year result in a net gain but ordinary loss if these sales yield a net loss.

Bittker & Lokken, supra, para. 47.3, at 47-29. The parties have stipulated that the hotel property is indeed a section 1231 asset.

Since section 1234A expressly refers to property that is "a capital asset in the hands of the taxpayer" and no other type of property, and since property described in section 1231 is excluded explicitly from the definition of "capital asset" in section 1221, we must conclude that the plain meaning of "capital asset"

as used in section 1234A does not extend to section 1231 property. We therefore are not convinced by petitioner's argument that the statute is inherently ambiguous.

If one looks to the plain meaning of section 1234A, it is true that the treatment of gains and losses from terminations of rights or obligations relating to property will depend on whether that property is a capital asset or is described in section 1231. Forfeited deposits from the termination of a contract to sell a hotel are taxed at capital gain rates if the hotel is held as a passive investment. The same forfeited deposits are taxed as ordinary income if the hotel is used in a trade or business. But regardless of any potential intellectual inconsistency in this disparate treatment, the plain meaning of section 1234A remains inescapable. We do not see any ambiguity in the apparent meaning of the statute.

While petitioner seeks to adduce the legislative history of section 1234A to impeach the statute's plain meaning, "where a statute is clear on its face, we require unequivocal evidence of legislative purpose before construing the statute so as to override the plain meaning of the words used therein." Rath v. Commissioner, 101 T.C. 196, 200-201 (1993) (citing Halpern v. Commissioner, 96 T.C. 895, 899 (1991), and Huntsberry v. Commissioner, 83 T.C. 742, 747-748 (1984)). We are unable find anything in the legislative history of section 1234A to

support petitioner's assertion that Congress intended to include section 1231

property within its ambit.[6]  We certainly find no evidence of a clear and

unambiguous expression of legislative purpose to do so.  Indeed, we have not seen

any reference to the application of section 1234A to section 1231 property outside

of isolated mentions by some legal commentators.

　　If Congress wished to extend section 1234A to section 1231 property, it has

had 35 years in which to amend the statute.  Section 1234A applies to "property

which is (or on acquisition would be) a capital asset in the hands of the taxpayer".

We find it telling that the statute does not read:  "property which has the same

character as the property to which the * * * [right or obligation] relates has in the

hands of the taxpayer (or would have in the hands of the taxpayer if acquired by

---

[6]The statute was originally enacted as part of the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 507(a), 95 Stat. at 333, and was aimed at tax straddles, which allowed taxpayers to effectively select the most favorable tax treatment in disposing of capital assets by strategically canceling forward currency or security contracts and thereby getting either ordinary losses or capital gains, S. Rept. No. 97-144, at 170 (1981), 1981-2 C.B. 412, 480.  The only substantive amendment to sec. 1234A potentially relevant here was by the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, sec. 1003(a), 111 Stat. at 909-910, which expanded the statute's scope from certain types of personal property to all property, including interests in real property and non-actively traded personal property.  This change was aimed at the same tax-straddle-type strategy, which by that time was being applied to various property interests besides personal property actively traded on established exchanges, to which sec. 1234A was limited when originally enacted.  See H.R. Rept. No. 105-148, at 453 (1997), 1997-4 C.B. (Vol. 1) 319, 775.

him)." <u>See</u> sec. 1234(a); <u>see also</u> sec. 1234B(a).  Had Congress intended to cover section 1231 property under section 1234A, Congress could have, and likely would have, used wording parallel to that in sections 1234 and 1234B.  The clarity of congressional purpose in restricting the reach of the statute to capital assets is ineluctable.  Accordingly, we hold that the plain meaning of the statute must govern here.

B.      <u>Caselaw Interpreting Section 1234A</u>

We have found the plain meaning of section 1234A to exclude section 1231 property from the statute's scope, with no contradictory interpretation suggested by any legislative history.  For the sake of thoroughness, however, we conclude with an examination of the caselaw interpreting section 1234A.

Section 1234A has not received extensive treatment in the caselaw.  In past cases, we have not even entertained the possibility that the statute would extend to section 1231 property.  <u>See, e.g.,</u> <u>Pilgrim's Pride Corp. v. Commissioner</u>, 141 T.C. 533, 548 (2013) ("In our view Congress extended the application of section 1234A to terminations of all rights and obligations with respect to property that is a capital asset in the hands of the taxpayer or would be if acquired by the taxpayer[.]"), <u>rev'd</u>, 779 F.3d 311 (5th Cir. 2015).  Neither have other courts.  <u>See, e.g.,</u> <u>Alderson v. United States</u>, 686 F.3d 791, 798 (9th Cir. 2012) (noting that

section 1234A "applies only to such '[g]ain or loss ... with respect to property which is a <u>capital asset</u> in the hands of the taxpayer" and finding that a right to a "relator's share was not a capital asset" (alteration in original)).

A series of cases addresses whether section 1234A changed the law in 1981 on the characterization of certain transactions or merely removed doubt as to their treatment.  See <u>Estate of Israel v. Commissioner</u>, 108 T.C. 208, 224-25 (1997), <u>rev'd and remanded on unrelated issue</u>, 159 F.3d 593 (D.C. Cir. 1998), <u>and rev'd and remanded sub nom.</u> <u>Wolff v. Commissioner</u>, 148 F.3d 186 (2d Cir.); <u>Vickers v. Commissioner</u>, 80 T.C. 394, 410-411 (1983); <u>Stoller v. Commissioner</u>, T.C. Memo. 1990-659, 1990 WL 212864, at *16-*17, <u>aff'd in part, rev'd in part</u>, 994 F.2d 855 (D.C. Cir. 1993).  These cases rule on the tax consequences of certain transactions in tax years preceding 1981 and so do not inform our decision in this matter.

Our most thorough examination of section 1234A was in <u>Pilgrim's Pride Corp. v. Commissioner</u>, 141 T.C. at 541-551.  In <u>Pilgrim's Pride</u> we ruled on whether a loss resulting from the abandonment of certain securities was ordinary or capital.  We reviewed the statute's legislative history to determine whether section 1234A applies to inherent property rights of ownership such as the right to dispose of property, as well as to derivative contractual rights and obligations, and

concluded that it does. Id. at 547-548. Although in Pilgrim's Pride we dealt with an issue different from that with which we deal here, our analysis of the statute's purpose remains unchanged: Congress originally enacted section 1234A to combat "straddles and other transactions exploited by tax shelter promoters" and in 1997 extended the statute's application "to all types of property that are (or on acquisition would be) capital assets in the hands of the taxpayer." Id. at 546. The Court of Appeals for the Fifth Circuit reversed our ultimate decision in Pilgrim's Pride and held that section 1234A applies to the abandonment of rights or obligations with respect to capital assets but not to the abandonment of the assets themselves. Pilgrim's Pride Corp. v. Commissioner, 779 F.3d at 315. However, the Court of Appeals did not dispute our interpretation of the legislative purpose underlying the enactment of section 1234A. See id. at 314-315. The Court of Appeals further reiterated the understanding, underlying the entire body of section 1234A jurisprudence, that "[b]y its plain terms, § 1234A(1) applies to the termination of rights or obligations with respect to capital assets (e.g. derivative or contractual rights to buy or sell capital assets)." Id. at 315.

IV.   Conclusion

We have examined the plain meaning of section 1234A and relevant caselaw. We find no support for petitioner's argument that section 1234A extends

to section 1231 property or that Congress intended that it do so. In effect, petitioner has invited us to expand the statute's scope by applying an interpretation contrary to its plain meaning and the plain intent of Congress. Since "[i]t is emphatically the province and duty of the judicial department to say what the law is", Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803), we cannot and will not apply a contrary interpretation where the law is otherwise valid and clear. We therefore decline petitioner's invitation to extend section 1234A to section 1231 property and so defer to the will of Congress as manifested in the text of the statute.

We have considered all of the parties' arguments, and to the extent not discussed above, conclude that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

                    Decision will be entered for respondent.