# United States Tax Court

164 T.C. No. 10

ABBVIE INC. AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 2597-23.                                    Filed June 17, 2025.

————

In 2014, P, a domestic public corporation, and S, a foreign public limited company, agreed to work toward a proposed combination. They entered into multiple agreements to facilitate that work and to define the terms of the proposed combination. Under a Co-operation Agreement, P promised, among other things, to pay S a fee of approximately $1.6 billion if P's board ultimately failed to recommend the combination to P's shareholders.

After the Department of the Treasury released adverse guidance concerning the tax treatment of transactions like the potential combination, P's board chose not to recommend the combination to P's shareholders. Instead, P and S entered into a Termination Agreement, which ended the Co-operation Agreement and required P to pay S a fee of approximately $1.6 billion.

On its 2014 return, P reported the fee as an ordinary deduction. R disallowed the deduction, reasoning that I.R.C. § 1234A(1) required P to treat the payment as a capital loss. Now before us are Cross-Motions for Summary Judgment regarding whether I.R.C. § 1234A(1) applies to P's payment to S under the Termination Agreement.

**Served 06/17/25**

*Held*: P's rights and obligations under the Co-operation Agreement were fundamentally in the nature of services.

*Held, further*, I.R.C. § 1234A(1) does not require P to treat its payment to S as a capital loss because, under the Co-operation Agreement, P did not have a "right or obligation . . . with respect to property" within the meaning of I.R.C. § 1234A(1).

*Held, further*, P's Motion for Summary Judgment will be granted and R's Motion for Summary Judgment will be denied.

————

*Daniel A. Rosen, Robert H. Albaral, Brendan J. Sponheimer, Sonya C. Bishop, Joy A. Williamson*, and *Don Crawford*, for petitioner.

*Steven N. Balahtsis, Khanh H. Tran*, and *Fang Y. McDermott*, for respondent.

OPINION

TORO, *Judge*: In July 2014, petitioner, AbbVie, Inc. (AbbVie), a domestic public corporation, and Shire plc (Shire), a foreign public limited company, announced that their boards had agreed on the terms of a recommended combination of the two companies. AbbVie and Shire then entered into contracts to facilitate the proposed combination and outline its terms. Among those contracts was a "Co-operation Agreement" that defined the steps each party would take to work towards the proposed combination. Within the Co-operation Agreement, AbbVie agreed to pay Shire a significant termination fee if it failed in carrying out its agreed responsibilities and, as a result of that failure, the combination did not occur.

Three months later, AbbVie scuttled the combination. The Department of the Treasury (Treasury) had released new guidance that threatened certain anticipated benefits of the combination, and so AbbVie's board chose not to recommend the combination to its shareholders. Instead, AbbVie and Shire executed a "Termination

Agreement," which terminated the Co-operation Agreement, and AbbVie paid Shire a termination fee of a little more than $1.6 billion.

Now before the Court are competing Motions for Summary Judgment addressing the proper treatment of the fee for federal income tax purposes. For its part, AbbVie maintains that it correctly deducted the fee as an ordinary expense. The Commissioner contends that section 1234A,[1] a character-shifting provision, required AbbVie to treat the fee as a capital loss. For the reasons we explain below, we will grant AbbVie's Motion and deny the Commissioner's.

## *Background*

The following facts are derived from the parties' pleadings, their Motion papers, and the First and Second Stipulations of Fact with attached Exhibits. They are stated solely for the purpose of ruling on the Motions before us and not as findings of fact in this case. *See Rowen v. Commissioner*, 156 T.C. 101, 103 (2021) (reviewed).

## I. *Proposed Combination*

In July 2014, AbbVie and Shire announced that their boards had agreed on the terms of a "recommended combination" of the companies.[2] Ex. 2-J, at 2. The terms of the proposed combination valued Shire at nearly $55 billion. Under the terms of the proposed combination, both AbbVie and Shire would come under the umbrella of New AbbVie, a Jersey company formed by AbbVie.[3] Shareholders of AbbVie and Shire would receive shares of New AbbVie in exchange for their existing shares.

The proposed combination was planned to proceed in two phases. In the first phase, Shire's shareholders would exchange their shares for shares of New AbbVie and cash pursuant to a court-sanctioned "scheme

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (I.R.C. or Code), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Some of the relevant documents refer to the proposed combination as a "proposed merger." For ease of reference, this Opinion uses the phrase "proposed combination" when referring to the overall combination of AbbVie and Shire and the phrase "proposed merger" when referring to certain component steps of the proposed combination that are described in greater detail below.

[3] The Bailiwick of Jersey, the largest of the Channel Islands, is a self-governing dependency of the British Crown, located off the coast of France.

of arrangement" between Shire and the Shire shareholders under the Jersey Companies Law of 1991.[4]  In the second phase, AbbVie would merge into a subsidiary of New AbbVie pursuant to an Agreement and Plan of Merger (Delaware Merger Agreement) that had to be approved by AbbVie's shareholders.

AbbVie, Shire, and related entities produced multiple joint documents to facilitate the proposed combination.  AbbVie and Shire issued a press announcement describing the terms of, and conditions applicable to, the combination.  AbbVie and Shire also executed the Co-operation Agreement, which "set out certain mutual commitments to regulate the basis on which they are willing to implement the [m]erger." Ex. 3-J, at 4.  And AbbVie entered into the Delaware Merger Agreement with two affiliated entities which, subject to shareholder approval, would cause AbbVie to become a subsidiary of New AbbVie.[5]  For our purposes, the Co-operation Agreement is central.

II.     *Terms of the Co-operation Agreement*

Through the Co-operation Agreement, AbbVie and Shire agreed to take steps to implement the proposed combination.  For its part, AbbVie agreed, among other things, to (1) take the lead in securing regulatory approval of the proposed combination and communicating with Shire about regulatory approvals, (2) "co-operate with Shire and its advisers to take all such steps as are reasonably necessary to implement the [proposed combination]," (3) recommend the Delaware Merger Agreement to its shareholders, call a shareholder meeting for purposes of voting on the Delaware Merger Agreement, and use best efforts to secure shareholder approval of the agreement, and (4) provide information and documentation as required ahead of Shire's shareholder vote. Ex. 3-J, at 4–10.  In turn, among other things, Shire promised to (1) assist AbbVie in communicating with regulators, (2) provide information to AbbVie as needed, and (3) notify AbbVie of any matters that could influence regulatory compliance.

---

[4] A scheme of arrangement (Scheme) is, in relevant part, a statutory process under Jersey law by which an arrangement between a company and its members may, if certain conditions are met, be sanctioned by an act (order) of the Royal Court of Jersey that binds both the shareholders who approved the Scheme and those who did not.  A Scheme becomes effective when the court order is delivered to the Jersey Companies Registrar.

[5] The Delaware Merger Agreement essentially established the mechanics for AbbVie's side of the proposed combination.

If the proposed combination was approved, AbbVie agreed in the Co-operation Agreement to be bound by the Scheme and to procure New AbbVie's adherence to the Scheme. AbbVie also was required to ensure that the New AbbVie shares that were to be issued to Shire shareholders pursuant to the Scheme ranked equally with the New AbbVie shares that were to be issued to AbbVie shareholders pursuant to the Delaware Merger Agreement. AbbVie further agreed to ensure that, as part of AbbVie's merger into New AbbVie's subsidiary, AbbVie shareholders would exchange one AbbVie share for one New AbbVie share. And AbbVie was required to implement the merger of AbbVie and New AbbVie's subsidiary pursuant to the Delaware Merger Agreement immediately following completion of the Scheme.

AbbVie's promise to recommend the Delaware Merger Agreement to its shareholders and seek their approval of the combination was critical to the Co-operation Agreement. The Co-operation Agreement provided:

> In connection with the [required meeting of AbbVie shareholders], the board of Directors of AbbVie shall . . . (1) recommend the adoption of the Delaware Merger Agreement by the holders of AbbVie Shares . . . and (2) use its reasonable best efforts to obtain the AbbVie Shareholder Approval . . . .

Ex. 3-J, at 8. AbbVie's board of directors could refuse to recommend the Delaware Merger Agreement, an eventuality described by the Co-operation Agreement as an "AbbVie Adverse Recommendation Change," but only if it "determine[d] in good faith by a majority vote, after considering advice from outside legal counsel, that the failure to take such action would be inconsistent with its fiduciary duties under Delaware Law." Ex. 3-J, at 9.

If AbbVie's Board chose not to recommend the Delaware Merger Agreement to the corporation's shareholders, AbbVie would face a penalty. Specifically, the Co-operation Agreement provided for AbbVie to pay a "Break Fee" under certain conditions, as set out in relevant part below:[6]

---

[6] Scholarly literature suggests that termination fees are common in the mergers and acquisitions space. *See generally* Afra Afsharipour, *Transforming the Allocation of Deal Risk Through Reverse Termination Fees*, 63 Vand. L. Rev. 1161,

**7.     BREAK FEE**

7.1     In consideration of Shire incurring substantial costs and expenses in preparing and negotiating the Acquisition and this Agreement, AbbVie undertakes that on the occurrence of a Break Fee Payment Event (as defined below) AbbVie will pay to Shire an amount in cash in US Dollars equal to three per cent of the product of the indicative value of the cash and shares to be delivered per Shire Share multiplied by the number of issued Shire Shares as set forth in Annex A and converted pursuant to the exchange rate set forth in Annex B (the "**Break Fee**").

7.2.    A **"Break Fee Payment Event"** shall occur in the event that at or prior to the termination of this Agreement:

7.2.1   both (i) an AbbVie Adverse Recommendation Change has occurred and (ii) either (a) the AbbVie Shareholder Approval has not been obtained at the AbbVie Shareholders Meeting, or any adjournment or postponement thereof, at which a vote on the adoption of the Delaware Merger Agreement is taken (such event being an "**Adverse Shareholder Vote**") or (b) a meeting of AbbVie's stockholders at which a vote on the adoption of the Delaware Merger Agreement is proposed has not occurred on or before the date falling 60 days (such date being the "**Shareholder Long Stop Date**") after the date of the AbbVie Adverse Recommendation Change or, (c) on or prior to the Shareholder Long Stop Date this Agreement terminates pursuant to clause 10.1.1

---

1163–65 (2010). They may be paid by the seller to the buyer or vice versa (as here) depending on each party's degree of interest in the deal and the risks the parties are attempting to account for, among other considerations. *See id.*; *see also Beck v. Dobrowski*, 559 F.3d 680, 683–84 (7th Cir. 2009) (discussing the propriety of termination fees in bidding contests).

and, at the time of such termination, the AbbVie Shareholder Approval has not been received[.][7]

Ex. 3-J, at 11–12. Shire was also protected if the combination did not go through for other reasons. Specifically, the Break Fee was payable if AbbVie invoked a regulatory condition to avoid proceeding with the combination or if certain other regulatory issues developed. And if AbbVie's shareholders failed to approve the combination under circumstances where the Break Fee was not payable, then AbbVie was still liable under another section of the Co-operation Agreement to reimburse Shire for expenses of $500 million or more that Shire incurred to facilitate the combination. This second potential fee was dubbed the "Cost Reimbursement Payment." Ex. 3-J, at 15.

III.    *Termination and Break Fee Payment*

On September 22, 2014, before either AbbVie's or Shire's shareholders had voted on the proposed combination, Treasury issued I.R.S. Notice 2014-52, 2014-42 I.R.B. 712. The Notice stated Treasury's intention to issue new regulations concerning inversion transactions. Those regulations would be retroactive to the date of the Notice—that is, before the proposed combination was completed.

On October 15, 2014, having reviewed the Notice, AbbVie's board of directors withdrew its recommendation that shareholders approve the proposed combination. In a Form 8–K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, that AbbVie filed with the Securities and Exchange Commission, it explained that the proposed Treasury regulations "introduced an unacceptable level of uncertainty to the transaction." Ex. 9-J, at 3. AbbVie acknowledged that the withdrawal, if accompanied by shareholder disapproval of the combination, could cause AbbVie to pay approximately $1.635 billion to Shire as a Break Fee.

Following the withdrawal of the AbbVie board's recommendation, AbbVie and Shire recognized that there was little prospect of AbbVie's shareholders approving the proposed combination. To tie up loose ends, on October 20, 2014, AbbVie and Shire entered into an agreement that

---

[7] The parties' agreements provided precise definitions for capitalized (but undefined) terms above, but the gist of the terms is sufficiently clear from the text, and we therefore do not reproduce the definitions here.

terminated the Co-operation Agreement. The Termination Agreement included the following recitals:

(A) The Parties [AbbVie and Shire] entered into a co-operation agreement on 18 July 2014 in respect of the Proposed Merger (the "**Co-operation Agreement**").

(B) The AbbVie Directors have withdrawn their recommendation to AbbVie stockholders that they vote in favour of the resolutions required to implement the Proposed Merger.

(C) The Proposed Merger is conditional upon, among other things, the affirmative approval of AbbVie stockholders. Following the withdrawal of the recommendation by the AbbVie Directors, the Parties consider that there is little prospect of the Proposed Merger being consummated.

(D) AbbVie and Shire have determined that it is in their respective best interests to terminate the Co-operation Agreement, and to make certain other arrangements relating to the termination of the Proposed Merger, as provided in this Agreement.

Ex. 6-J, at 3. The Termination Agreement then terminated the Co-operation Agreement. As a condition of that termination, the agreement required AbbVie to pay a Break Fee in the same amount that would have been due under the Co-operation Agreement.[8] AbbVie made its payment of $1,635,410,676 on October 21, 2014.

IV. *AbbVie's Tax Return and the Notice of Deficiency*

AbbVie timely filed Form 1120, U.S. Corporation Income Tax Return, for its taxable year ending December 31, 2014. On the return, AbbVie claimed the Break Fee payment as an ordinary deduction.

On December 6, 2022, after examining AbbVie's 2014 return, the Commissioner issued to AbbVie a Notice of Deficiency determining a deficiency of approximately $572 million. As explained in the Notice,

---

[8] Given the Break Fee's genesis in the Co-operation Agreement, our analysis below focuses mainly on the terms of that agreement.

the Commissioner determined that the Break Fee payment "is not deductible as an expense under [section] 162 or as an ordinary loss under [section] 165 because the payment of that amount and termination of an agreement resulted in loss that is treated under [section] 1234A as loss from the sale of a capital asset." Ex. 1-J, at 11. Accordingly, the Commissioner determined that the amount should be "treated as [a] capital loss rather than [an] ordinary deduction." *Id.* The Commissioner also made other computational adjustments to AbbVie's return as a result of his determination concerning the Break Fee.

V.    *Procedural History*

Upon receiving the Notice of Deficiency, AbbVie timely filed the Petition upon which this case is based. At the time, AbbVie's principal place of business was in Illinois.

The parties filed Cross-Motions for Summary Judgment on whether section 1234A(1) applies here. AbbVie argues that the provision does not apply to the Break Fee and that, as a result, it correctly claimed an ordinary deduction for the Break Fee. The Commissioner, for his part, argues that section 1234A(1) applies and requires AbbVie to treat the Break Fee as a capital loss. For the reasons described below, we agree with AbbVie.

*Discussion*

I.    *Summary Judgment*

The purpose of summary judgment is to expedite litigation and avoid costly, time-consuming, and unnecessary trials. *Fla. Peach Corp. v. Commissioner*, 90 T.C. 678, 681 (1988). The Court may grant summary judgment when there is no genuine dispute as to any material fact and a decision may be rendered as a matter of law. Rule 121(a)(2); *Sundstrand Corp. v. Commissioner*, 98 T.C. 518, 520 (1992), *aff'd*, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the adverse party. *Sundstrand Corp.*, 98 T.C. at 520. The parties agree that summary disposition is appropriate here.

II.     *Deductions for Ordinary Business Expenses and Ordinary and Capital Losses*

Taxpayers generally may deduct all ordinary and necessary business expenses paid or incurred during the taxable year.  I.R.C. § 162(a).  Additionally, as a general rule, taxpayers may deduct any unreimbursed losses sustained during the taxable year.  I.R.C. § 165(a).

In the normal course, section 165(a) allows a deduction for costs related to abandoned capital transactions.  *A.E. Staley Mfg. Co. & Subs. v. Commissioner*, 119 F.3d 482, 490 (7th Cir. 1997), *rev'g* 105 T.C. 166 (1995); *see also Sibley, Lindsay & Curr Co. v. Commissioner*, 15 T.C. 106, 110 (1950).  "[E]xpenses incurred in the development of plans involving the organization or reorganization of corporations become deductible when the plans are abandoned . . . ."  *El Paso Co. v. United States*, 694 F.2d 703, 712 (Fed. Cir. 1982) (per curiam); *see also A.E. Staley Mfg. Co. & Subs. v. Commissioner*, 119 F.3d at 490 ("[The taxpayer's subsidiary] contemplated numerous capital transactions that were later abandoned . . . .  The fees paid to the investment bankers in connection with those abandoned transactions are therefore deductible as [an] abandonment loss under § 165(a).").

The general rule for losses is subject to multiple exceptions.  *E.g.*, I.R.C. § 165(c), (d), (f).  In particular, sections 1211 and 1212 limit the deductibility of "[l]osses from sales or exchanges of capital assets."  I.R.C. § 165(f).  Section 1211(a), which applies only to corporate taxpayers, permits "losses from sales or exchanges of capital assets . . . only to the extent of gains from such sales or exchanges." In other words, corporate taxpayers may deduct capital losses only to the extent those losses offset capital gain.  *See Pilgrim's Pride Corp. v. Commissioner*, 779 F.3d 311, 314 n.5 (5th Cir. 2015), *rev'g* 141 T.C. 533 (2013).  And they may not deduct capital losses against ordinary income.  *See id.*

Ordinary losses, on the other hand, are subject to no such limitation.  *Cf. Vines v. Commissioner*, 126 T.C. 279, 288 (2006) (explaining that ordinary losses can offset ordinary income, while capital losses are subject to the limits of section 1211).  And taxpayers may deduct ordinary losses against capital gain as well as ordinary income.  Thus, characterizing losses as ordinary often leads to more favorable outcomes for taxpayers—the same favorable outcomes that are available for ordinary and necessary business expenses.

III.   *Section 1234A*

Before Congress enacted section 1234A, courts had issued decisions about the character of losses related to the cancellation or termination of contracts. *See, e.g.*, *U.S. Freight Co. & Subs. v. United States*, 422 F.2d 887 (Ct. Cl. 1970). Some of these decisions permitted taxpayers to treat contract cancellations as generating ordinary, rather than capital, losses. *See, e.g.*, *Stoller v. Commissioner*, 994 F.2d 855, 858 (D.C. Cir. 1993) ("We simply agree with the 97th Congress that prior to [section 1234A] the prevailing rule was that the cancellation of a contract resulted in an ordinary loss for tax purposes."), *aff'g in part, rev'g in part* T.C. Memo. 1990-659; *see also, e.g.*, *Wolff v. Commissioner*, 148 F.3d 186, 190 (2d Cir. 1998) ("Whether the 97th Congress intended to affect a change in the law or merely clarify it by enacting § 1234A, the Senate Finance Committee at least recognized that authority had developed which supports the taxpayers' position [that such losses are ordinary]."), *rev'g and remanding* T.C. Memo. 1994-196.

Taxpayers recognized that they could take advantage of these developments in the law. Specifically, taxpayers strategically canceled contracts that would, if performed, have generated a capital loss, thereby transforming a capital loss into an ordinary one. *Cf.* Kevin M. Keyes, *Federal Taxation of Financial Instruments & Transactions* ¶ 17.06[1] (2024) ("Congress was concerned that some taxpayers and tax shelter promoters were exploiting the extinguishment doctrine cases."). In other words, taxpayers could elect the loss character that suited them.

Some taxpayers took things a step further by entering into contractual arrangements, known as "tax straddles," that used this electivity to their benefit. Linda E. Carlisle & Sarah K. Ritchey, *The Schizophrenic World of Code Sec. 1234A*, 12 J. Tax'n Fin. Prods. 11 (2015); Keyes, *supra*, ¶ 17.06[1]. Essentially, a taxpayer would execute two offsetting contracts, one of which would increase in value while the other decreased, or vice versa. When it came time to cash out, the taxpayer would perform the appreciated contract—realizing a capital gain—and cancel the depreciated contract for an ordinary loss. Even if a taxpayer had zero economic gain or loss over the two contracts, the taxpayer could receive a tax benefit from the differing treatment of capital and ordinary gains and losses.

The legislative history to section 1234A contains a useful example of a tax straddle:

[A] taxpayer may simultaneously enter into a contract to buy German marks for future delivery and a contract to sell German marks for future delivery with very little risk. If the price of German marks thereafter declines, the taxpayer will assign his contract to sell marks to a bank or other institution for a gain equivalent to the excess of the contract price over the lower market price and cancel his obligation to buy marks by payment of an amount in settlement of his obligation to the other party to the contract. The taxpayer will treat the sale proceeds as capital gain and will treat the amount paid to terminate his obligation to buy as an ordinary loss.

S. Rep. No. 97-144, at 171 (1981), *reprinted in* 1981 U.S.C.C.A.N. 105, 267.

Concerned about the use of tax straddles and the power of taxpayers to elect the treatment of certain losses, Congress enacted section 1234A in 1981. *See Pilgrim's Pride Corp. v. Commissioner*, 779 F.3d at 314 ("Congress passed Section 1234A to address tax straddles . . . ."). The original provision generally required taxpayers with gains or losses attributable to terminations of rights with respect to personal property to treat those gains or losses as capital. Thus, applied to the example above, it required the taxpayer to treat the amount paid to terminate his obligation to buy German marks as a capital loss, eliminating his tax advantage.

Since 1981, Congress has amended section 1234A multiple times, most notably in 1997 to expand its scope from "personal property" to "property" generally. *See generally* Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1003(a)(1), 111 Stat. 788, 910. For the year at issue here, section 1234A read as follows:

Sec. 1234A. Gains or losses from certain terminations
Gain or loss attributable to the cancellation, lapse, expiration, or other termination of—
(1) a right or obligation (other than a securities futures contract, as defined in section 1234B) with respect to property which is (or on acquisition would be) a capital asset in the hands of the taxpayer, or

> (2) a section 1256 contract (as defined in section 1256) not described in paragraph (1) which is a capital asset in the hands of the taxpayer,
>
> shall be treated as gain or loss from the sale of a capital asset. The preceding sentence shall not apply to the retirement of any debt instrument (whether or not through a trust or other participation arrangement).

The question before us now is whether this provision required AbbVie to treat the Break Fee as giving rise to a capital loss on its 2014 return.

## IV. *Application of Section 1234A(1) to AbbVie's Break Fee Payment*

Section 1234A(1) applies when four requirements are met.[9] First, there must be a gain or loss. Second, that gain or loss must be attributable to the cancellation, lapse, expiration, or other termination of a right or obligation. Third, the terminated right or obligation must be "with respect to" property. *Cf. Pilgrim's Pride Corp.*, 141 T.C. 533 (determining whether property rights inherent in ownership are "with respect to" property). Fourth, the property underpinning the terminated right or obligation must currently be (or would on acquisition be) a capital asset in the hands of the taxpayer. *Alderson v. United States*, 686 F.3d 791, 798 (9th Cir. 2012) ("[Section 1234A] applies only to such '[g]ain or loss . . . with respect to property which is a *capital asset* in the hands of the taxpayer.'"); *CRI-Leslie, LLC v. Commissioner*, 147 T.C. 217, 225–29 (2016) (discussing the meaning of section 1234A), *aff'd*, 882 F.3d 1026 (11th Cir. 2018); *Patrick v. Commissioner*, 142 T.C. 124, 129 n.6 (2014) ("[The taxpayers] have not demonstrated the existence of a capital asset, and sec. 1234A does not apply."), *aff'd*, 799 F.3d 885 (7th Cir. 2015).

Because the third requirement is not satisfied here, we rule in AbbVie's favor.[10]

---

[9] This discussion focuses on section 1234A(1), the relevant provision for our case, and does not relate to section 1234A(2).

[10] The parties have made a number of other arguments regarding the requirements of section 1234A(1), including whether the Break Fee was an ordinary and necessary business expense deductible under section 162(a) or a loss under section 165(a) and whether Shire stock would have been a capital asset in AbbVie's hands. Given our conclusion with respect to the third requirement noted above, we do not address these arguments.

A.     *A Right or Obligation with Respect to Property*

The parties agree that AbbVie paid the Break Fee to terminate the Co-operation Agreement.  What we must determine, then, is whether the Co-operation Agreement conferred upon AbbVie any "right[s] or obligation[s] . . . with respect to property" within the meaning of section 1234A(1).

As always, we begin with the statute's ordinary meaning.  *See Whistleblower 972-17W v. Commissioner*, 159 T.C. 1, 13 (2022) (reviewed) (citing *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2256, 2364 (2019)); *see also United States v. Melvin*, 948 F.3d 848, 851–52 (7th Cir. 2020).  In this contractual context, the term "right" generally means something to which a party has a claim as a legal matter.  *See Right, The Random House College Dictionary* (rev. ed. 1980) ("[A] just claim or title, whether legal, prescriptive, or moral."); *Right, Black's Law Dictionary* (5th ed. 1979) ("A legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act."); *see also Dennis v. Higgins*, 498 U.S. 439, 447 n.7 (1991) (defining "right" in the context of 42 U.S.C. § 1983); Restatement (First) of Prop. § 1 (Am. L. Inst. 1936).  Similarly, "obligation" means a course of action to which a person is bound—i.e., a duty or commitment.  *See Obligation, The Random House College Dictionary* (rev. ed. 1980) ("Something by which a person is bound to do certain things and which arises out of a sense of duty or results from custom, law, etc."); *Obligation, Black's Law Dictionary* (5th ed. 1979) ("That which a person is bound to do or forbear; any duty imposed by law, promise, contract, relations of society, courtesy, kindness, etc.").

Considering the Co-operation Agreement and the related arrangements between the parties, there is no doubt that AbbVie had rights and obligations related to its proposed combination with Shire.  AbbVie, for example, undertook to (1) take the lead in securing regulatory approval of the proposed combination, (2) "co-operate with Shire and its advisers to take all such steps as are reasonably necessary to implement the [proposed combination]," (3) recommend the Delaware Merger Agreement to its shareholders and use best efforts to secure shareholder approval, and (4) provide information and documentation as required ahead of Shire's shareholder vote.  Ex. 3-J, at 4–10.  It also was obligated to pay Shire the Break Fee if the combination failed to occur following certain events and to pay the Cost-Reimbursement Fee if the combination failed to occur following certain other events.

The key question, however, is whether any of AbbVie's myriad rights and obligations under the Co-operation Agreement were "with respect to property."

The ordinary meaning of the phrase "with respect to" is "concerning" or "relating to." *See Respect*, *The Random House College Dictionary* (rev. ed. 1980) ("[R]elation or reference: *inquiries with respect to a route*."). That meaning has remained constant over time. *See, e.g.*, *Varian Med. Sys., Inc. & Subs v. Commissioner*, 163 T.C. 76, 109 (2024) (citing *Respecting*, *The American Heritage Dictionary* (5th ed. 2018) ("With respect to; concerning.")); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 856 (2018) (Thomas, J., concurring in part and in the judgment) ("The phrase 'with respect to' means 'referring to,' 'concerning,' or 'relat[ing] to.'" (quoting *Oxford American Dictionary & Language Guide* (1999 ed.))); *Khan v. United States*, 548 F.3d 549, 556 (7th Cir. 2008) ("Synonyms for 'with respect to' include 'pertaining to' and 'concerning.'" (quoting *Encarta World English Dictionary* (2007))).

Courts have given this phrase and similar ones a broad meaning. *Varian*, 163 T.C. at 110; *see Cal. Tow Truck Ass'n v. City & Cnty. of S.F.*, 807 F.3d 1008, 1021 (9th Cir. 2015); *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (defining the phrase "related to" as embracing those things "having a connection with or reference to" something else (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008))); *Adams Challenge (UK) Ltd. v. Commissioner*, 154 T.C. 37, 63 (2020) (analyzing relevant cases and finding "no appreciable difference between the terms 'related to,' 'connected with,' and 'in connection with'").

With that said, as decisions of the Supreme Court and this Court have recognized, broad connecting phrases like "with respect to" and "related to" are necessarily limited by the context in which Congress uses them. *See Whistleblower 972-17W*, 159 T.C. at 15–16 & n.14 ("The Supreme Court has 'eschewed uncritical literalism leading to results that no sensible person could have intended' 'when confronted with capacious phrases' like 'in connection with,' 'related to,' and 'arising from.'" (quoting *Jennings*, 138 S. Ct. at 840 (Alito, J.) (plurality opinion))); *see also FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016, revised Jan. 28, 2016) ("As we have explained in addressing similar terms like 'relating to' or 'in connection with,' a non-hyperliteral reading is needed to prevent the statute from assuming near-infinite breadth." (first citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 656 (1995); and then citing *Maracich*

*v. Spears*, 570 U.S. 48, 59 (2013))); *Elec. Power Supply Ass'n*, 577 U.S. at 296 (Scalia, J., dissenting) (agreeing that the "so-called 'affecting' jurisdiction cannot be limitless"). Otherwise, these phrases could be read as "essentially 'indeterminat[e]' because connections, like relations, '"stop nowhere."'" *Whistleblower 972-17W*, 159 T.C. at 15 (quoting *Maracich*, 570 U.S. at 59–60 (cleaned up)). In short, as the Supreme Court said most recently, "phrases that govern conceptual relationships—like 'with respect to'"—have meanings that "inherently depend on their surrounding context." *United States v. Miller*, 145 S. Ct. 839, 853 (2025).

AbbVie offers a hypothetical that illustrates the need for context to prescribe the meaning of "with respect to" in section 1234A. In the hypothetical, a worker is hired to wash the windows on a commercial skyscraper. *See* Pet'r's Br. 40. The worker and the property manager enter into a fixed-fee contract for the worker's services, and the contract provides for a termination fee in the event that the manager terminates the contract. Neither the worker nor the manager owns any interest in the skyscraper. Eventually, the manager decides to terminate the agreement and pays the termination fee.

In this example, the fixed-fee contract is "with respect to property" in the broad sense that the skyscraper is the subject matter of the contract. But, as both parties agree, we would not apply section 1234A to convert the worker's services income from the contract termination to capital gain where neither the worker nor the manager had any interest in the skyscraper or would have acquired any such interest in the skyscraper under the terms of the terminated contract. Rather than capturing any interest that touches property, section 1234A applies only to a smaller set of rights and obligations.

Our task, then, is to employ the tools of statutory interpretation to discern the meaning of the phrase "with respect to property." In undertaking this task, "we must as always consider 'the structure of the statute and its other provisions.'" *Whistleblower 972-17W*, 159 T.C. at 15–16 (quoting *Maracich*, 570 U.S. at 60). The statute's scope excludes any rights and obligations that have only a "remote relation to" property. *See Maracich*, 570 U.S. at 59; *see also id.* at 89 (Ginsburg, J., dissenting) ("[W]hen the Court has sought a limiting principle for similar statutory language, it has done so to prevent the application of a statute to matters with 'only a tenuous, remote, or peripheral connection' to the statute's core purpose." (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans*, 514 U.S. at 661)). And, in all events,

context will be critical to our inquiry. *See Miller*, 145 S. Ct. at 853 (explaining that the contextual canon "carries particular force when construing phrases . . . like 'with respect to'"); *Dubin v. United States*, 143 S. Ct. 1557, 1566 (2023) ("That the phrase ['in relation to'] refers to a relationship or nexus of some kind is clear. . . . Yet the kind of relationship required, its nature and strength, will be informed by context.").

Close consideration of the context here tells us that a right or obligation "with respect to property" within the meaning of section 1234A is a right or obligation to exchange (i.e., to buy, sell, or otherwise transfer or receive) an interest in property. We explain below.

1.      *The Provision's Operation and Neighboring Text*

First, the role that section 1234A plays in the Code is instructive. Essentially, it is a character-shifting provision designed to capture gains and losses from transactions that, if completed, would have resulted in sales, potentially generating capital gain or loss. (Recall the example of an individual who enters into separate contracts to buy and sell German marks. *See supra* pp. 11–12.) Congress was concerned that taxpayers who enter such arrangements could, under previous law, elect the most advantageous tax treatment available to them by selling any "winners" (i.e., contracts that increased in value) and canceling or otherwise terminating any "losers" (i.e., contracts that decreased in value). This allowed taxpayers to realize capital gains when they came out ahead and ordinary losses when they fell behind, avoiding altogether the less advantageous categories of ordinary gains and capital losses.

Section 1234A was Congress's solution, and it accomplishes Congress's objective by providing that "gain or loss" from terminations, etc. of "a right or obligation . . . with respect to property . . . shall be treated as gain or loss from the sale of a capital asset." We have been focused on the "with respect to property" portion, but the surrounding text is also instructive. Namely, the consequence of being caught by the provision is being treated as selling a capital asset. This tells us something about the kinds of rights or obligations likely targeted by the provision—i.e., rights and obligations that, if *not* canceled or otherwise terminated, would have resulted in a capital transaction.[11] Or, in other

---

[11] "For those who consider legislative history relevant," *Warger v. Shauers*, 574 U.S. 40, 48 (2014), we note that both the Senate Finance Committee and the House Committee on Ways and Means took this view when describing the proposed provision

words, transactions where an interest in property would have changed hands.

Further supporting this reading, section 1234A(1) applies only to rights and obligations "with respect to property *which is (or on acquisition would be) a capital asset in the hands of the taxpayer*." (Emphasis added.) AbbVie reads the emphasized text to mean that the taxpayer must either directly own the property at issue or have "anticipatory possessory rights" in the property. To resolve this case, we need not decide (and therefore we do not decide) whether the taxpayer *directly* must have future rights in the property.[12] But we do agree that the statutory reference suggests that, at a minimum, the underlying transaction must have included (had the transaction in fact occurred) a direct or indirect transfer of a property interest to or from the taxpayer.

### 2. *The Text of Related Provisions*

Additional statutory text supports this reading. Specifically, when section 1234A was enacted in 1981, the enacting statute included an effective date provision. That provision stated that new section 1234A (among other provisions) would apply "to property acquired and positions established by the taxpayer after June 23, 1981, in taxable years ending after such date." Economic Recovery Tax Act of 1981 (ERTA), Pub. L. No. 97-34, § 508(a), 95 Stat. 172, 333. It further provided taxpayers with an election to apply the new rule to "futures contracts or positions held by the taxpayer on June 23, 1981 . . . effective for periods after such date in taxable years ending after such date." ERTA § 508(c), 95 Stat. at 333.

---

in 1981, *see* H.R. Rep. No. 97-201, at 213 (1981) ("In order to insure [sic] that gains and losses from transactions economically equivalent to the sale or exchange of a capital asset obtain similar treatment, the bill adds a new section 1234A to the Code."); S. Rep. No. 97-144, at 170 ("The committee believes that the change . . . is necessary to prevent tax-avoidance transactions designed to create fully-deductible ordinary losses on certain dispositions of capital assets, which if sold at a gain, would produce capital gains. . . . The committee considers this ordinary loss treatment inappropriate if the transaction . . . is economically equivalent to a sale or exchange."), 1981 U.S.C.C.A.N. at 266–67.

[12] In particular, we do not address the parties' disagreement over whether section 1234A applies if a taxpayer terminates an obligation to cause another party, such as a subsidiary, to buy or sell property.

The references to "positions established" and "positions held" by the taxpayer are telling.[13] Section 1234A does not define the term "position," but another provision, also enacted by ERTA, does. Specifically, section 1092(d)(2) says that "[t]he term 'position' means an interest (including a futures or forward contract or option) in personal property." *See also* ERTA § 501(a), 95 Stat. at 323, 325. (Recall that, when it was originally enacted, section 1234A also applied to rights and obligations with respect to only "personal property.")[14] So we infer that the rights and obligations with respect to property referred to in section 1234A(1) must take the form of property interests, consistent with our prior discussion.

### 3. *Prior Caselaw*

Finally, our interpretation is consistent with how various courts have characterized section 1234A(1), although no court has considered the precise issue before us. For example, the U.S. Court of Appeals for the Eleventh Circuit said the following when discussing the provision:

> Stated simply, Section 1234A says that any gain or loss that results from the termination of *an agreement to buy or sell property* that is properly classified as a "capital asset" will, notwithstanding the termination, be treated as a gain or loss from a consummated sale. Section 1234A thereby ensures capital-gains treatment of *income resulting from canceled property sales* by relaxing the "sale or exchange" element of the Code's general definition of "[l]ong-term capital gain"—*i.e.*, "gain from the sale or exchange of a capital asset held for more than 1 year . . . ." I.R.C. § 1222(3).

*CRI-Leslie, LLC v. Commissioner*, 882 F.3d at 1029 (emphasis added). Other courts, including this Court, have used similar wording. *See, e.g.*, *Pilgrim's Pride Corp. v. Commissioner*, 779 F.3d at 315 ("By its plain terms, § 1234A(1) applies to the termination of rights or obligations with respect to capital assets (*e.g. derivative or contractual rights to buy or*

---

[13] The reference to "property acquired" in the effective date provision more naturally relates to portions of the enacting statute other than the provision that enacted section 1234A. *See, e.g.*, ERTA § 502, 95 Stat. at 327. But in any event we do not view it as inconsistent with our reading.

[14] Additionally, we note that the enacting statute included section 1234A in "TITLE V—Tax Straddles" of the Act. *See* ERTA tit. V, 95 Stat. at 323.

*sell capital assets*). It does not apply to the termination of ownership of the capital asset itself." (Emphasis added.)); *Estate of McKelvey v. Commissioner*, 161 T.C. 130, 143 (2023) ("Thus, by its terms, section 1234A(1) applies to the termination of obligations with respect to capital assets, which include derivative or contractual rights to buy or sell such assets."). In reading section 1234A(1), these courts focused on rights to buy and sell capital assets. Our approach does the same.

4.      *Summary*

To summarize, in the context of section 1234A(1), a "right or obligation . . . with respect to property" is a right or obligation to transfer (for example, to buy, sell, or otherwise transfer) property or a property interest. By contrast, a right or obligation to perform services related to property or to otherwise act without such a transfer is not a "right or obligation . . . with respect to property" within the meaning of section 1234A(1).

B.      *Rights and Obligations Under the Co-operation Agreement*

1.      *The Crux of the Agreement*

Applying this standard to the case before us is not straightforward, because AbbVie's rights and obligations under the Co-operation Agreement are many and multifaceted. But, when we consider the essence of the agreement taken as a whole, we find the required connection lacking.

At its core, the Co-operation Agreement is not an agreement to buy, sell, or otherwise transfer property. *See A.E. Staley Mfg. Co. & Subs. v. Commissioner*, 119 F.3d at 487 ("[D]istinguishing between ordinary and capital costs often requires a rather pragmatic approach."). In fact, it could not be such an agreement, because the parties to the agreement (AbbVie and Shire) did not own the valuable property (their own shares) that would have been exchanged in the proposed combination. In other words, none of the Co-operation Agreement's terms could have conferred "rights or obligations with respect to [AbbVie or Shire shares]" because the power to confer such rights rested with the companies' public shareholders. Although AbbVie's board of directors could exert some influence over the choices of AbbVie's shareholders—for example, by placing the Delaware Merger Agreement for a vote and recommending the proposed combination—it could not, under the terms of the proposed combination, effect any exchange of property rights on its own.

As a result, the best AbbVie and Shire could do was an aspirational arrangement, with each party agreeing to do everything it could to facilitate a potential combination. But neither side could commit to the combination, because that decision was in the hands of the companies' shareholders and, to some extent, regulators and the Jersey court.

Consistent with this reality, AbbVie's core obligations under the Co-operation Agreement were in the nature of services to increase the likelihood that a combination would occur. For example, the Co-operation Agreement required AbbVie, among other things, to pursue necessary regulatory approvals for the combination and use best efforts to secure those approvals, to recommend the combination to its shareholders, and to host a shareholder meeting for a vote on the combination before a specified date. These are important obligations to be sure, but they are not obligations with respect to property within the meaning of section 1234A(1). Rather, they are simply promises to provide services to clear the way for a desired exchange of stock.

Based on our careful review of the record, we find that these facilitative services were the crux of the Co-operation Agreement. Critically, it was the withdrawal of the AbbVie board's recommendation in support of the combination that triggered AbbVie's obligation to pay the Break Fee under section 7 of the Co-operation Agreement, the parties' termination of the Co-operation Agreement, and AbbVie's ultimate payment of the Break Fee. In other words, it was not AbbVie's failure to *complete* the combination that triggered the liability; instead, it was the failure of the AbbVie board to *recommend* the combination to AbbVie's shareholders. Considering this point in the broader context of the Co-operation Agreement, we conclude that the Break Fee was not paid to terminate rights and obligations with respect to property within the meaning of section 1234A(1).

2.     *AbbVie's Obligation to Implement the Combination, Once Approved*

It does not change our view that, under the Co-operation Agreement, AbbVie also had obligations to implement the proposed combination if it was approved. These obligations included causing New AbbVie to comply with the Scheme (i.e., by acquiring Shire), as well as ensuring that the New AbbVie shares that were to be issued to Shire shareholders ranked equally with the New AbbVie shares that were to be issued to AbbVie shareholders pursuant to the Delaware Merger

Agreement. (Recall that the Scheme was the first half of the proposed combination, through which Shire was to become a subsidiary of New AbbVie.) AbbVie also was required to ensure that, as part of AbbVie's merger into New AbbVie's subsidiary, AbbVie shareholders would exchange one AbbVie share for one New AbbVie share. And AbbVie was required to implement the proposed merger of AbbVie and New AbbVie's subsidiary pursuant to the Delaware Merger Agreement immediately following completion of the Scheme.

These obligations were the mechanics by which AbbVie was to effect the wishes of the AbbVie and Shire shareholders had the combination been approved. But they were not the crux of the Co-operation Agreement, which, as we have discussed, primarily required AbbVie and Shire to clear the way for the proposed combination and to secure their shareholders' approval of the combination. Failure to perform these "combination implementation" obligations was not a ground that could have triggered AbbVie's liability for the Break Fee under section 7 of the Co-operation Agreement. In fact, the remedy for any failure to implement the combination following its approval, as described in the Delaware Merger Agreement, was specific performance—not the payment of a fee.[15]

The Commissioner does not appear to argue otherwise, as his arguments focus on AbbVie's rights and obligations with respect to the Shire shares (i.e., the shares that Shire shareholders would have exchanged for New AbbVie shares pursuant to the Scheme). By contrast, AbbVie's postapproval obligations to implement the combination under the Co-operation Agreement generally were connected with shares of New AbbVie or its own shares. Again, these obligations were not the essence of the Co-operation Agreement, and failure to satisfy them could not have triggered AbbVie's liability to pay the Break Fee.

### 3. *The Question of Contingent Rights and Obligations*

Turning our attention to AbbVie's purported rights and obligations with respect to the Shire shares, the Commissioner asserts that "AbbVie had the right and the obligation to cause New AbbVie to

---

[15] It makes sense that the parties provided for the remedy of specific performance in this context, because once the Scheme was implemented and the Shire shareholders had exchanged their shares for New AbbVie shares, the only way for those shareholders to receive the benefit of their bargain would be completion of the combination under terms the parties had already agreed on.

directly or indirectly acquire the shares of Shire stock." Resp't's Mem. in Supp. of Mot. for Summ. J. 38. But this line of argument misapprehends the structure of section 1234A(1).

Absent approval from Shire's shareholders or the Jersey court, neither AbbVie nor New AbbVie had any right or obligation to acquire the Shire shares. The Co-operation Agreement did not commit either party to make such a purchase. It could not have done so, as we have said, because Shire, AbbVie's counterparty under the agreement, did not own the shares and had no authority to agree to such a sale. For that reason, the Co-operation Agreement was fundamentally a services agreement, not an agreement to buy, sell, or otherwise transfer capital assets.

This is not to say that rights and obligations must be absolute to be subject to section 1234A(1). The Commissioner points out, and in principle we agree, that the provision encompasses certain contingent rights and obligations. But that principle does not help the Commissioner here.

The Commissioner views this case as covered by section 1234A(1) because, in his view, the Co-operation Agreement obligated New AbbVie to acquire Shire's shares, subject to the condition that, among other things, the AbbVie and Shire shareholders needed to approve the transaction.

The problem with the Commissioner's position is that, while provisions of the Co-operation Agreement may be styled as conditions, they really reflect AbbVie's and Shire's lack of authority to agree firmly to an actual combination. In other words, this was not a situation in which parties with complete authority to buy and sell property agreed to do so subject to certain conditions, as would generally be within their power to do. Here, AbbVie and Shire did not own their own shares and lacked legal authority to agree to transactions with respect to those shares. Nor is there any indication in the record that they had control over the outcome by other means. The most they could do, therefore, was to agree to convince their shareholders to buy and sell (i.e., in essence to perform services).[16]

---

[16] For this reason, failure to execute the proposed combination was not a violation of the Co-operation Agreement. Instead, the agreement recognized that the proposed combination might not occur for any number of reasons, including the Shire

In these circumstances, considering all the provisions of the Co-operation Agreement, we conclude that any rights and obligations AbbVie had related to Shire's shares were not obligations "with respect to property" within the meaning of section 1234A(1).

### 4. *Legislative History*

The Commissioner also relies on legislative history to argue that AbbVie's Break Fee should be treated as a capital loss. Of course, legislative history cannot displace the statute's unambiguous text. *See Food Mktg. Inst.*, 588 U.S. at 436 ("Even [members of the Supreme Court] who sometimes consult legislative history will never allow it to be used to 'muddy' the meaning of 'clear statutory language.'" (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011))). The text of section 1234A(1) is sufficiently clear to convince us that it does not apply to the Break Fee.

But even if we were to consider the legislative history of section 1234A, it cuts strongly against the application of the provision to the Break Fee. Reports from the House Ways and Means Committee, the Senate Finance Committee, and the House-Senate Conference Committee in 1981 all state that Congress enacted section 1234A to make certain "that gains and losses from transactions *economically equivalent to the sale or exchange of a capital asset* obtain similar treatment." H.R. Rep. No. 97-201, at 213 (emphasis added); S. Rep. No. 97-144, at 171 (using identical terms), 1981 U.S.C.C.A.N. at 267; H.R. Rep. No. 97-215, at 260 (1981) (Conf. Rep.) ("The conference agreement follows the House bill and Senate amendment."), *reprinted in* 1981 U.S.C.C.A.N. 285, 349. And while Congress amended section 1234A in 1997, the amendment extended the section to other types of *property*, not to more tenuously related contracts. *See* H.R. Rep. No. 105-148, at 454 (1997) ("The bill extends *to all types of property* the rule . . . ." (emphasis added)), *as reprinted in* 1997 U.S.C.C.A.N. 678, 848; S. Rep. No. 105-33, at 135 (1997) (same), *reprinted in* 1997-4 C.B. (Vol. 2) 1067, 1215.[17] The Co-operation Agreement was essentially a contract

---

shareholders' failure to approve the deal, the AbbVie shareholders' failure to approve the deal, and the failure of a regulatory approval, among others.

[17] Highlighting this point, the 1981 Report of the House Ways and Means Committee specifically noted: "The new rule does not apply to dispositions of property, which is neither personal property within the definition in section 263A(e)(1) nor commodity-related property described in section 1092(d)(4). Thus, the tax treatment of such transactions as abandonment losses on trademarks, now treated as ordinary

for services, and its termination does not resemble, let alone equal, the sale or exchange of a capital asset. *Cf. Property*, *Black's Law Dictionary* (12th ed. 2024) ("The law of property is the law of proprietary rights *in rem*, the law of proprietary rights *in personam* being distinguished from it as the law of obligations." (quoting John Salmond, *Jurisprudence* 423–24 (Glanville L. Williams ed., 10th ed. 1947))). Consistent with the provision's text, the history of section 1234A supports that the Break Fee should not be treated as a capital loss.

V.      *Conclusion*

In sum, because the Break Fee is not attributable to the "termination of . . . a right or obligation . . . with respect to property" but is instead attributable to the termination of an Agreement that "set out certain mutual commitments to regulate the basis on which [AbbVie and Shire] [were] willing to implement the [proposed combination]," section 1234A(1) does not apply to it. Accordingly, AbbVie need not, on account of section 1234A(1), treat the Break Fee as a capital loss.

To reflect the foregoing,

*An appropriate order and decision will be entered.*

---

losses, is not changed." H.R. Rep. No. 97-201, at 213. In 1997, the Senate Finance Committee Report similarly observed:

> By definition, the extension of the "sale or exchange rule" of present law section 1234A to all property will only affect property that is not personal property which is actively traded on an established exchange. Thus, the committee bill will apply to (1) interests in real property and (2) non-actively traded personal property. An example of the first type of property interest that will be affected by the committee bill is the tax treatment of amounts received to release a lessee from a requirement that the premise be restored on termination of the lease. An example of the second type of property interest that is affected by the committee bill is the forfeiture of a down payment under a contract to purchase stock. The committee bill does not affect whether a right is "property" or whether property is a "capital asset."

S. Rep. No. 105-33, at 135–36 (footnotes omitted), 1997-4 C.B. (Vol. 2) at 1215–16.